UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
---------------------------------------------------------------------X
 JOHN COLLAZO,

                                                  Civil Case No: 2:17-CV-6378

                  Plaintiff,

        -against-                            __COMPLAINT__

PRIVATUS CARE SOLUTIONS, INC.,
WILLIAM MULLETT, individually,            Plaintiff Demands a
JOHN BERNARDI, individually,               Trial by Jury
CANDACE COSTAS, individually,
PRIYANKI AMROLIWALA, individually,
JOAN KARDOS, individually,and,
CHRISTINE SPAULDING, individually.

                        Defendants.
---------------------------------------------------------------------X

       Plaintiff, JOHN COLLAZO (hereinafter referred to as "COLLAZO" and/or "Plaintiff"), by and through his attorneys, DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendant, PRIVATUS CARE SOLUTIONS, INC. (hereinafter referred to as "PRIVATUS"), Defendant WILLIAM MULLETT (hereinafter referred to as "MULLETT"), individually, Defendant JOHN BERNARDI (hereinafter referred to as "BERNARDI"), individually, Defendant CANDACE COSTAS (hereinafter referred to as "COSTAS"), individually, Defendant PRIYANKI AMROLIWALA (hereinafter referred to as "AMROLIWALA"), individually, Defendant JOAN KARDOS (hereinafter referred to as "KARDOS"), and Defendant CHRISTINE SPAULDING (hereinafter referred to as "SPAULDING") (hereinafter collectively referred to as "DEFENDANTS") upon information and belief, as follows:

## NATURE OF CASE

1.  Plaintiff brings this action, charging that the Defendants violated Plaintiff's rights

pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§

2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991,

Pub. L. No. 102-166) ("Title VII"), 42 U.S.C. §1981, as amended by the Civil Rights

Act of 1991, the Americans with Disabilities Act of 1990 ("ADA"), as amended, The

Age Discrimination in Employment Act of 1967 ("ADEA"), and to remedy

violations of the New Jersey Law Against Discrimination ("NJLAD"), based upon

the supplemental jurisdiction of this Court pursuant to *United Mine Workers of*

*America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory

and injunctive relief and damages to redress the injuries that Plaintiff has suffered as

a result of, *inter alia*, race discrimination, color discrimination, national origin

discrimination, disability discrimination, age discrimination, and religious

discrimination, together with hostile work environment, retaliation and unlawful

termination by Defendants.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is conferred upon this Court as this case involves a Federal

Question under Title VII, 42 U.S.C. §1981, the ADA, and the ADEA. The Court also

has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent

jurisdiction thereto.

3. Additionally, this Court has supplemental jurisdiction under the State law causes of

action asserted in this action.

4. On or about April 19, 2016, Plaintiff submitted a Charge with the U.S. Equal

Employment Opportunity Commission ("EEOC").

5. On or about May 25, 2017, Plaintiff received a Right to Sue Letter from the EEOC.

6. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

7. Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the District of New Jersey.

## **PARTIES**

8. Plaintiff JOHN COLLAZO is an individual man who is a resident of the State of New Jersey, County of Bergen.

9. Plaintiff is a 43 year old Hispanic man.

10. Defendant PRIVATUS CARE SOLUTIONS, INC. is a foreign for-profit corporation duly existing by the virtue and laws of the State of Delaware that does business in the State of New Jersey.

11. At all times material, PRIVATUS provides private nursing care services to individuals and families.

12. At all times material, PRIVATUS employed Plaintiff.

13. At all times material, WILLIAM MULLETT was and is the Chief Executive Officer (CEO) of Defendant PRIVATUS.

14. At all times material, MULLETT had supervisory authority over Plaintiff with regard to his employment.

15. At all times material, JOHN BERNARDI was the President of Defendant PRIVATUS.

16. At all times material, BERNARDI had supervisory authority over Plaintiff with regard to his employment.

17. At all times material, CANDACE COSTAS was the Executive Vice President for Defendant PRIVATUS.

18. At all times material, COSTAS had supervisory authority over Plaintiff with regard to his employment.

19. At all times material, PRIYANKI AMROLIWALA was the Director of Talent Acquisition for Defendant PRIVATUS.

20. At all times material, AMROLIWALA had supervisory authority over Plaintiff with regard to his employment.

21. At all times material, JOAN KARDOS was the Vice President of Operations for Defendant PRIVATUS.

22. At all times material, KARDOS had supervisory authority over Plaintiff with regard to his employment.

23. At all times material, CHRISTINE SPAULDING (hereinafter referred to as "SPAULDING") was and is the Director of Clinical Services for Defendant PRIVATUS.

24. At all times material, SPAULDING had supervisory authority over Plaintiff with regard to his employment.

## MATERIAL FACTS

25. On or about February 4, 2015, Plaintiff began his employment with Defendants in their new location at 95 State Route 17, Suite 109 in Paramus, New Jersey 07652.

26. Defendants hired Plaintiff as a Talent Acquisition Manager and Human Resources Specialist.

27. At the time of Plaintiff's unlawful termination, Plaintiff's salary was $69,000.00.

28. At all times material, Plaintiff reported directly to Defendant PRIVATUS' Director of Talent Acquisition, AMROLIWALA.

29. From the onset, AMROLIWALA instructed Plaintiff on numerous occasions how the race, dress, and personality of potential applicants were extremely important to Defendants.

30. Specifically, Defendants instructed Plaintiff to hire only White healthcare providers.

31. Defendants constantly reminded Plaintiff of this discriminatory policy and Defendant PRIVATUS' Directors, MULLETT, BERNARDI, COSTAS, KARDOS, AMROLIWALA, and SPAULDING, constantly enforced this discriminatory policy.

32. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

33. Defendants gave Plaintiff explicit instructions describing whom to hire as applicants, and detailed certain physical characteristics and attributes that were only possessed by White women.

34. Defendants frequently instructed Plaintiff that he was to hire applicants that had, "blond ponytails swinging," and to avoid candidates with "braided hair."

35. For instance, in or around the end of February 2015, Plaintiff had a conversation with SPAULDING regarding Defendant' discriminatory hiring policy. Plaintiff specifically expressed to SPAULDING his concern regarding Defendants' request that Plaintiff only hire specific races, predominantly Whites.

36. SPAULDING acknowledged that Defendants wanted Plaintiff to hire candidates based solely on their race; however, SPAULDING stated, "This is what the company expects, so we need to do it." Furthermore, SPAULDING continued to say, "The

truth is, the Certified Home Health Aides or Nurses, Africans, Haitians, and the 'ghetto blacks,' aren't good for our clients." SPAULDING informed Plaintiff that she had experienced this in her past jobs and strongly believed it to be true.

37. Plaintiff was appalled that his complaint regarding Defendants' discriminatory hiring practices was not only known, but accepted by Defendant PRIVATUS' employees - even upper management.

38. Plaintiff told SPAULDING that her view of, "Africans, Haitians, and 'ghetto blacks,'" being poor candidates for clients was not true and clearly not the case. Plaintiff told SPAULDING, "This is a field that is very ethnically diverse, and I have had different experiences placing quality candidates for all races, in nursing homes and hospitals, and have never experienced any such problems." SPAULDING shrugged her shoulders, stepped into her office, and instructed Plaintiff, "Just do what they want you to do, if you want to keep your job."

39. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers. As a result, Plaintiff was stunned and began to feel anxious and depressed.

40. Several weeks later, in or around March 2015, Plaintiff had several conversations with Defendant PRIVATUS' Vice President of Operations, KARDOS, regarding Defendants' discriminatory hiring practices. KARDOS attempted to make light of the situation by making jokes. Further, KARDOS informed Plaintiff that the discriminatory practice was in place due to Defendant's other locations previously having issues with, "the black race" and their hair texture. KARDOS reminded

Plaintiff that Defendants' discriminatory hiring practice was OK, because, "this is what our clients want."

41. KARDOS continued to say, "Latino's are fine because they're fair skinned," and, "Dominican's are fine as long as they aren't too dark."

42. Later that week, in or around March 2015, Plaintiff told KARDOS that he was uncomfortable with Defendants' discriminatory hiring practice from both an ethical and moral standpoint. In an effort to deflect the situation, KARDOS shared a story with Plaintiff from when she worked at Columbia Hospital in New York City. KARDOS told Plaintiff that KARDOS and her staff had an inside joke where they would use the phrase, "bowling for Jews." Plaintiff asked KARDOS what she meant by, "bowling for Jews." KARDOS explained that, "bowling for Jews," arose from the fact that during Rosh Hashanah, the "Jewish people" needed to be home by sundown and would rush through the doors, practically knocking things over like bowling pins. As KARDOS was explaining this "joke" and laughing, Plaintiff found KARDOS' behavior to be degrading, racist, disrespectful, and unprofessional - especially for Defendant's Vice President of Operations.

43. This culture of discrimination was evident at every level of Defendant PRIVATUS' organization, and the more time Plaintiff spent working for Defendants, the more Plaintiff realized that this hatred and bigotry stemmed from Defendant PRIVATUS' executives and directors.

44. In or around the end of March 2015, KARDOS approached Plaintiff and informed him that the partners (MULLETT, BERNARDI, and COSTAS) were coming to the Paramus, NJ office to conduct training on hiring the "right and proper" candidates.

This training was nothing more than another attempt to sway Plaintiff to hire only slim, blue-eyed blondes. This model of "slim, blue-eyed blondes," became known as the, "Privatus Way." At the conclusion of the training session, Defendants made clear and reinforced to Plaintiff that he was to hire in accordance with their discriminatory mandate.

45. On or about June 3, 2015, Plaintiff met with AMROLIWALA at Defendant PRIVATUS' New York City office to review candidates that Plaintiff recently hired. Throughout the course of their discussion, AMROLIWALA repeatedly asked Plaintiff what race each candidate was. Specifically, AMROLIWALA inquired, "She's African-American?" or, "Are they Caucasian?"

46. After noticing that Plaintiff had several applicants that were not White, AMROLIWALA informed Plaintiff, "I don't know if you're bringing in the right people."

47. In fact, AMROLIWALA stated, "What's her race? Caucasian. Oh OK, so you do have good nurses here." Furthermore, AMROLIWALA said, "She's Caucasian? Yea, so that's a good one."

48. In regards to the meeting discussed above, on or about June 12, 2015, AMROLIWALA sent Plaintiff an email in which she stated, "I forgot to ask you, what is the race of the two RN's [Registered Nurses]?"

49. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

50. On or about June 11, 2015, Plaintiff met with Defendant PRIVATUS' Vice President of Operations, KARDOS. Plaintiff and KARDOS were discussing several applicants

that Plaintiff had met with during a new hire orientation. KARDOS instructed Plaintiff that he was not to hire a specific candidate because she was African-American and wore braids in her hair. KARDOS referred to this applicant as "hair girl," and stated that she was, "concerned about her braids, a lot of up-do braids."

51. Later that day, on or about June 11, 2015, Plaintiff met with Defendant PRIVATUS' Director of Clinical Services, SPAULDING. Plaintiff and SPAULDING examined several candidates within Defendant PRIVATUS' database of applicants. During the course of their conversation, SPAULDING instructed Plaintiff that he needed to hire more White candidates.

52. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire not only White but *young* healthcare providers. Defendants' discriminatory practice extended into the realm of age.

53. Plaintiff informed SPAULDING that he would be breaking the law by discriminating against certain races and stated, "What I don't understand is, we already have enough white nurses." SPAULDING stated, "But they're not young. They don't have ponytails swinging." Plaintiff was perplexed, he stated, "So what the hell is it? So you want a white nurse or you want a young-" SPAULDING interjected, "They want someone young!"

54. During the course of their conversation, Plaintiff introduced the name of several potential candidates to which SPAULDING made discriminatory and racist remarks.

55. For instance, Plaintiff mentioned to SPAULDING a potential applicant whose name is, upon information and belief, "Achiya Nana." Immediately, SPAULDING replied, "Not good, she's black."

56. Plaintiff was stunned. Plaintiff replied, "But, there's no picture -" to which SPAULDING responded, "You can tell by the name." Plaintiff was then able to find a picture of Ms. Nana and revealed to SPAULDING that in fact, Ms. Nana is not African-American.

57. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

58. Furthermore, during the course of the same conversation between Plaintiff and SPAULDING on or about June 11, 2015, Plaintiff introduced another applicant to SPAULDING, to which SPAULDING replied, "No picture - O, she's black."

59. Plaintiff responded, "Yea, she is an RN, does she look any different than what we have?" SPAULDING replied, "Yea, she looks worse."

60. SPAULDING informed Plaintiff that the applicant looked worse because she was African-American.

61. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

62. Plaintiff and SPAULDING continued to review candidates when again, SPAULDING stated, "Byawa - she's not white." Plaintiff responded, "There's no picture."

63. Plaintiff and SPAULDING then reviewed an applicant named Winston Barrow. This applicant provided a picture that indicated she was African-American. SPAULDING stated, "Mhmm, I could've told you just by the name Winston."

64. In fact, SPAULDING instructed Plaintiff that he should ask for photo identification of each applicant.

65. SPAULDING's comments made Plaintiff feel extremely uncomfortable.

66. SPAULDING instructed Plaintiff not to worry about the discriminatory hiring mandates because that was the type of applicant that Defendants wanted. SPAULDING stated, "It's no use worrying about it John, it is what it is, you know?"

67. Plaintiff is Hispanic and felt that he too was being discriminated against, because he is not Caucasian. Plaintiff attempted to make light of the extremely uncomfortable situation and told SPAULDING, "I don't even have my picture on the website. They're probably like, eh. Maybe that's a sign…they might be like, well, we don't know about this guy, I mean look at this guy."

68. On or about June 17, 2015, Plaintiff met with MULLETT, BERNARDI, COSTAS, KARDOS, and SPAULDING.

69. Throughout the course of their conversation, the above mentioned employees of Defendant PRIVATUS made numerous discriminatory remarks regarding the race, color, and national origin of various applicants.

70. For instance, COSTAS stated, "We need to have the looks that someone - that can blend into the client environment. Certainly there's no scenario which, uh, somebody with a history of working in correctional facilities hah."

71. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

72. Furthermore, COSTAS said, "We know the perception that obese people are lazy or stupid. We want someone with height in proportion to weight."

73. In fact, Defendants provided Plaintiff with a handout titled, "Deal Breakers" that listed "Height not in proportion to weight, but not excessively so, offset by style of dress," as a "Negative."

74. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him not to hire obese people, falling under the protected class of a perceived disability.

75. After established the discriminatory baseline, COSTAS began to review a potential applicant. While discussing the applicant's qualifications, COSTAS said, "UMASS, Bachelors Degree, Deans List -" when Defendant PRIVATUS' CEO, MULLETT, abruptly interjected and made a sound signifying disapproval, "X, next one down." COSTAS then stated, "Ohh, she got her bachelors degree in Port-au-Prince, Haiti." MULLETT followed up and stated, "Yea, and she's probably a smart person and everything else that goes with it -" KARDOS then stated, "Although, when you talk about RN's in England or Ireland that's a different animal." MULLETT agreed and stated, "Yea, that's a different animal - no need to move further than that - that would not - none of our high-end clients would ask for that, that would kill us." COSTAS chimed in, "Doesn't mean shes not a good nurse." MULLETT informed Plaintiff that hiring a Black applicant from Haiti would kill Defendant's business, because none of Defendant PRIVATUS' high-end clients would request a Black applicant from Haiti.

76. Defendants instructed Plaintiff not to hire applicant's similar to the one discussed, based solely on the fact that the applicant was from Port-au-Prince, Haiti, and most likely a dark skinned African-American. Defendants even admitted that the applicant

may have been a good nurse; however, Defendants instructed Plaintiff not to hire applicants based solely on the applicant's national origin, race, and color.

77. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

78. COSTAS, followed this applicant's review by stating, "I worked with a great nurse from Meadow Green, she was from Haiti and left Meadow Green to work in a prison, -" Again, MULLETT abruptly interrupted and began laughing at COSTAS' statement. COSTAS finished by saying, "Our clients wouldn't want her but she was a great nurse."

79. At the conclusion of their meeting, KARDOS pulled Plaintiff aside and stated, "Our nursing bench is not bad. We have our fair share of white women, but get the white woman back! They're on my bench." A 'bench' is a term used within the industry to describe a pool of candidates waiting to be placed into homes.

80. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

81. In or around July 2015, AMROLIWALA was no longer an employee of Defendant PRIVATUS.

82. On or about July 22, 2015, Plaintiff met with KARDOS to discuss changes in the hierarchy of the company now that AMROLIWALA was no longer Plaintiff's supervisor.

83. During the course of their conversation, Plaintiff discussed his concerns regarding Defendants' discriminatory hiring policy. KARDOS responded, "I know you feel stifled, and like you have a noose around your neck. I get that and I understand, but

one of the best home health aides in Connecticut, I cannot understand on the phone. Her name is Charity Obawano or something - ya know she's, she's African - and I'm talking about dark is dark is dark - blacker than this if you can get blacker." KARDOS went on to explain that Ms. Obawano was an exceptional nurse and even clients that had specifically requested only Caucasian or Hispanic aides, ended up being very happy with her performance.

84. As a follow-up to KARDOS' meeting with Plaintiff the day before, on or about July 23, 2015, KARDOS sent an email to Plaintiff as well as two (2) other employees. In the body of KARDOS' email, she stated, "I had an Operation meeting with the partners yesterday. It was agreed that you are all doing a great job in your respective areas." Still, KARDOS began to discuss the information that the partners were looking for in an applicant's biographical profile. KARDOS stated that in terms of presentation, Defendants were looking for a candidate possessing the following qualities, "polished, well dressed, ***blond ponytail swinging etc.***"

85. Plaintiff understood KARDOS' statement to clearly indicate Defendants' mandate to hire only White female applicants.

86. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White healthcare providers.

87. Throughout the fall of 2015, Plaintiff complained to Defendants on numerous occasions that he was extremely uncomfortable with the discriminatory hiring practice that Defendants forced Plaintiff to comply with. Plaintiff began to feel as though his continued complaints were frustrating upper management.

88. In or around January 2016, Plaintiff was reviewing applicants with SPAULDING. SPAULDING informed Plaintiff that KARDOS wanted Plaintiff to, "start with Caucasian's first and then move down the line." Plaintiff was shocked at the egregious and blatant nature of Defendants' discriminatory motive. Once again, Plaintiff voiced his concerns to SPAULDING and KARDOS.

89. Shortly thereafter, on or about January 12, 2016, Defendants terminated Plaintiff in retaliation for Plaintiff's continuous complaints of discriminatory hiring practices.

90. Defendants' reason for terminating Plaintiff was merely pretextual. Defendants informed Plaintiff that he was terminated for budgetary constraints. However, the New Jersey office had been quite profitable.

91. Plaintiff suspected that the reason proffered was merely pretextual and asked MULLETT why Defendants' had recently hired two (2) new employees - a Director of Clinical Services for the New York City office, as well as a new Sales Liason in the New York City office. In fact, the new Sales Liason began working for Defendant PRIVATUS the same day that Plaintiff was terminated.

92. MULLETT ignored Plaintiff's question.

93. Defendants subjected Plaintiff to a hostile work environment on the grounds that they instructed him to hire only White, young, and not overweight healthcare providers.

94. Furthermore, upon information and belief, shortly after Defendants terminated Plaintiff and a staffing coordinator for alleged budgetary constraints, Defendant PRIVATUS created a job posting for the position of staffing coordinator.

95. This is clearly inconsistent behavior and directly contradicts Defendants' pretextual statement that Plaintiff was terminated for budgetary constraints. Defendants' contradictory behavior coupled with the temporal proximity of Plaintiff's last complaint, provides an inference of discriminatory and retaliatory motive.

96. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

97. As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments.

98. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

99. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants.

100. The above are just some of the examples of unlawful and discriminatory conduct to which Defendants subjected Plaintiff.

**AS A FIRST CAUSE OF ACTION
UNDER FEDERAL LAW
42 U.S.C. SECTION 1981
(AGAINST ALL DEFENDANTS)**

101. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

102. 42 U.S.C.A. Section 1981 states in relevant part as follows:

(a) "Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981.

103. Defendants discriminated against Plaintiff, as a member of the Hispanic race, in violation of the rights afforded to him by 42 U.S.C. §1981.

104. By the conduct described above, Defendants intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens, to the creation, performance, enjoyment, and all benefits and privileges of their contractual relationship with Defendants, in violation of 42 U.S.C. §1981.

105. Further, Defendants constantly enforced a purposefully discriminatory pattern and practice of depriving other non-white individuals of the equal rights described therein, in further violation of 42 U.S.C. §1981.

106. As a result of Defendants' discrimination in violation of Section 1981, as a member of the Hispanic race, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship which provided substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief; and having suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling Plaintiff to compensatory damages.

107. As alleged above, Defendants acted with malice or reckless indifference to the rights of the Plaintiff and copious other individuals named herein, thereby entitling Plaintiff to an award of punitive damages.

108. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## TITLE VII
## (AGAINST DEFENDANT PRIVATUS)

109. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

110. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a) [Section 703] provides that it shall be an unlawful employment practice for an employer:

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . ."

111. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by subjecting Plaintiff to discrimination on the basis of his national origin, color, race, and religion, together with causing a hostile work environment based on the same.

112. Further, Defendants encouraged Plaintiff to engage in and promote said unlawful discriminatory practices on the basis of the national origin, color, race, and religion of others in his official capacity with PRIVATUS, causing a hostile work environment.

113. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Title VII.

114. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS A THIRD CAUSE OF ACTION
### FOR RETALIATION UNDER
### TITLE VII
### (AGAINST DEFENDANT PRIVATUS)

115. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

116. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

117. Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e *et seq.,* by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of Defendants.

118. Defendants violated the above and Plaintiffs suffered numerous damages as a result.

### AS A FOURTH CAUSE OF ACTION
### UNDER NEW JERSEY STATE LAW
### DISCRIMINATION
### (AGAINST ALL DEFENDANTS)

119. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

120. New Jersey's Law Against Discrimination ("NJLAD") Section 10:5-12(a) sets forth in pertinent part as follows:

"It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: (a) For any employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

121. Defendants engaged in unlawful discriminatory practices prohibited by NJLAD Section 10:5 *et seq.*, by discriminating against Plaintiff because of his national origin, color, race, and religion, together with causing a hostile work environment based on the same.

122. Further, Defendants encouraged Plaintiff to engage in and promote said unlawful discriminatory practices on the basis of the national origin, color, race, religion, disability, and age of others, in his official capacity with PRIVATUS, causing a hostile work environment.

123. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of the NJLAD Section 10.

124. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A FIFTH CAUSE OF ACTION
UNDER NEW JERSEY STATE LAW
RETALIATION
(AGAINST ALL DEFENDANTS)**

125. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

126. New Jersey Law Against Discrimination §10:5-12(d) provides that it shall be an unlawful discriminatory practice:

"For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted by this act."

127. Defendants engaged in unlawful discriminatory and retaliatory practices prohibited by NJLAD Section 10:5 *et seq.*, by retaliating and otherwise discriminating against Plaintiff, including, but not limited to, terminating Plaintiff's employment, because of Plaintiff's opposition to Defendants' unlawful employment practices.

128. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A SIXTH CAUSE OF ACTION**
**UNDER NEW JERSEY STATE LAW**
**AIDING AND ABETTING**
**(AGAINST ALL DEFENDANTS)**

129. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

130. New Jersey Law Against Discrimination §10:5-12(e) provides that it shall be an unlawful discriminatory practice:

"For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."

131. Defendants engaged in an unlawful discriminatory practice prohibited by NJLAD Section 10:5 *et seq.*, by aiding, abetting, inciting, compelling and/or coercing the discriminatory, unlawful, and retaliatory conduct as stated herein.

132. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A SEVENTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER**
**THE AMERICANS WITH DISABILITIES ACT**
**(AGAINST ALL DEFENDANTS)**

133. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

134. Plaintiff claims Defendants violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

135. SEC. 12112. [Section 102] specifically states:

"(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

136. Defendants violated the section cited herein by discriminating against obese people, blacklisting them as part of their hiring practice. In doing so, Defendants' maintained a discriminatory work environment based on disability and perceived disability, exposing Plaintiff to a hostile work environment by asking him to further said discriminatory animus as a term and condition of his employment.

137. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of the ADA.

138. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS AN EIGHTH CAUSE OF ACTION
### FOR RETALIATION UNDER
### THE AMERICANS WITH DISABILITIES ACT
### (AGAINST ALL DEFENDANTS)

139. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

140. Plaintiff claims Defendants violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

141. SEC. 12203. [Section 503] states,

"(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

142. Defendants engaged in unlawful employment practice prohibited by the above statute, by retaliating against Plaintiff with respect to the terms, conditions or privileges of his employment because of his opposition to the unlawful employment practices of Defendants.

143. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A NINTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER
THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967
(AGAINST ALL DEFENDANTS)**

144. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

145. The Age Discrimination in Employment Act of 1967, 29. U.S.C. 623 (a) provides in pertinent part that:

"It shall be unlawful for an employer-

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;…"

146. The exact number of employees at PRIVATUS is unknown, but upon information and belief, there are well more than the statutory minimum.

147. Defendants engaged in unlawful discriminatory and retaliatory employment practices prohibited by 29. U.S.C. 623 *et seq*., by discriminating against candidates that PRIVATUS executives considered were no longer deemed "young" candidates, blacklisting them as part of their hiring practice. In doing so, Defendants maintained a discriminatory work environment based on age, exposing Plaintiff to a hostile work environment by asking him to further said discriminatory animus as a term of his employment.

148. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A TENTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967
## (AGAINST ALL DEFENDANTS)

149. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

150. The Age Discrimination in Employment Act of 1967, 29. U.S.C. 623 (d) provides in pertinent part that:

> "It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation,  proceeding, or litigation under this chapter."

151. Defendants engaged in unlawful discriminatory and retaliatory employment practices prohibited by 29. U.S.C. 623 *et seq*., by discriminating against candidates that PRIVATUS executives considered were no longer deemed "young" candidates, blacklisting them as part of their hiring practice. In doing so, Defendants maintained a discriminatory work environment based on age, exposing Plaintiff to a hostile work environment by asking him to further said discriminatory animus as a term of his employment.

152. Defendants engaged in unlawful employment practice prohibited by the above statute, by retaliating against Plaintiff with respect to the terms, conditions or privileges of his employment because of his opposition to the unlawful employment practices of Defendants.

153. Defendants violated the above and Plaintiff suffered numerous damages as a result.


## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.


**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practices prohibited by Title VII, 42 U.S.C. §1981, the ADA, the ADEA, and the New Jersey Law Against Discrimination, and that Defendants harassed and discriminated against Plaintiff, and encouraged similar behavior in him as a term of his employment, on the basis of race, national origin, religion, age, and disability, together with creating a hostile work environment, retaliation and wrongful termination;

B. Awarding damages to the Plaintiff, retroactive to his date of discharge, for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful termination of employment and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation;

D. Awarding Plaintiff punitive damages against all Defendants, jointly and severally;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Very truly yours,

DEREK SMITH LAW GROUP, PLLC
*Attorneys for Plaintiff*

Dated:  August 23, 2017
              New York, New York

By: _/s/_____
     Zack Holzberg, Esq.
     30 Broad Street, 35th Floor
     New York, New York 10004
     (212) 587-0760